## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

NIRIN WALLS,

                  **Plaintiff,**

v.

LANA NALEWAJKA, DR. VIPIN
SHAH, and DR. JODI PELEGRIN,

                  **Defendants.**

                  Case No. 21-CV-01369-SPM

## <u>MEMORANDUM AND ORDER</u>

**McGLYNN, District Judge:**

      This matter comes before the Court for consideration of a Motion for Summary Judgment filed jointly by Defendants Dr. Jodi Pelegrin and Dr. Vipin Shah (Doc. 197) and a Motion for Summary Judgment filed by Defendant Lana Nalewajka (Doc. 203). *Pro se* Plaintiff Nirin Walls filed Responses in Opposition to both Motions. (*See* Docs. 219, 220, 221). Having fully considered the issues presented herein, the Court **GRANTS** both Motions for Summary Judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

      *Pro se* Plaintiff Nirin Walls is an inmate currently incarcerated at Lawrence Correctional Center in Sumner, Illinois. (*See* Doc. 194). The instant case arises from treatment Walls received for urinary, stomach, and testicular pain and associated complications while he was incarcerated at Centralia Correctional Center in Centralia, Illinois, prior to his transfer to Dixon Correctional Center in Dixon, Illinois. (*See* Doc. 2). Walls initially filed a Complaint in this District on October 27,

2021.[1] This Court conducted preliminary review of Walls' Complaint pursuant to 28 U.S.C. § 1915A on April 22, 2022. (Doc. 16). The Court consolidated Walls' claims as follows: (1) a claim for Eighth Amendment deliberate indifference to his serious medical condition against Defendants Dr. Vipin Shah, Dr. Jodi Pelegrin, and Centralia Health Care Unit Administrator Lana Nalewajka (*Id.* (citing Doc. 2)) and (2) a claim pursuant to the Eighth Amendment against Defendants Pelegrin and Nalewajka for failure to impose a medical hold on Walls resulting in his transfer and delay of medical care. (*Id.* (citing Doc. 2)). Defendants Shah, a physician at Centralia Correctional Center employed by Wexford Health Sources, Inc., and Pelegrin, the Medical Director at all relevant times at Centralia Correctional Center employed by Wexford Health Sources, Inc., jointly filed a Motion for Summary Judgment for failure to exhaust administrative remedies on January 17, 2023. (Doc. 56). Defendant Nalewajka, an employee of Illinois Department of Corrections as the Health Care Unit Administrator at Centralia at all relevant times, separately moved for summary judgment on the issue of exhaustion in February 16, 2023. (Doc. 64). The Court denied both Motions on September 20, 2023. (Doc. 87). Defendants requested a *Pavey* hearing and reconsideration by the

---

[1] Walls' original Complaint encompassed claims related to his treatment both while at Centralia Correctional Center and Dixon Correctional Center. *See Walls v. Jeffreys*, No. 21-cv-01350-SMY (S.D. Ill. 2021) (Doc. 1). On November 1, 2021, District Judge Yandle severed Walls' claims related to events which took place at Centralia from claims related to events which took place at Dixon; the claims related to treatment at Centralia were filed separately as the instant matter and the claims related to his treatment at Dixon were transferred to the Northern District of Illinois. *See id.* (Doc. 7); *see also Walls v. Mershon et al.*, No. 3:21-cv-50418 (N.D. Ill. 2026). No claims remained before Judge Yandle following the severance of the claims; Walls' Northern District of Illinois matter was resolved at the summary judgment stage on January 27, 2026. *See Walls v. Mershon et al.*, Case No. 3:21-cv-50418 (N.D. Ill. 2026) (Docs. 239, 240).

Court; this Court held the *Pavey* hearing on February 29, 2024. (Doc. 137). On March 4, 2024, this Court determined that Defendants had failed to meet their burden to show that the administrative review process was available to Walls and denied the Motions for Summary Judgment. (Doc. 138).

Pelegrin and Shah jointly filed the instant Motion for Summary Judgment (Doc. 197) and Memorandum in Support (Doc. 198) on June 20, 2025. Nalewajka filed her Motion for Summary Judgment and Memorandum in Support on June 30, 2025. (Doc. 203). On August 5, 2025, Walls filed a Response in Opposition and Supplemental Response in Opposition to the Motion filed by Defendants Shah and Pelegrin (Docs. 219, 220); Walls filed a Response in Opposition to the Motion filed by Defendant Nalewajka on August 8, 2025. (Doc. 221).

## Legal Standard

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Stated another way, the nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) *(*citing *Lujan v.*

*Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008) (quoting *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008)). The nonmovant cannot simply rely on its pleadings; the nonmovant must present admissible evidence that sufficiently shows the existence of each element of its case on which it will bear the burden of proof at trial. *Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (citing *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 394 (7th Cir. 1993), *cert. denied*, 510 U.S. 1111 (1994); *Celotex*, 477 U.S. at 323–24).

## ANALYSIS

The Eighth Amendment prohibits cruel and unusual punishment and deliberate indifference to the "serious medical needs of a prisoner [which] constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Claims for deliberate indifference have an objective and a subjective

component. *Estelle v. Gamble*, 429 U.S. 97 (1976). Walls must establish that he suffered from an objectively and sufficiently serious medical condition. *Cesal v. Moats,* 851 F.3d 714, 721 (7th Cir. 2017). He must also show that the Defendants actually knew of, but disregarded, a substantial risk to his health. *Cesal,* 851 F.3d at 721. "A doctor's choice of 'easier and less efficacious treatment' for an objectively serious medical condition also may be sufficient . . . [,] [b]ut 'mere disagreement with a doctor's medical judgment' is not enough to support an Eighth Amendment violation." *Id.* (first quoting *Estelle*, 429 U.S. at 104 & n.10; then quoting *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)).

Additionally, it is well-settled that mere negligence is not enough to establish a Defendant's deliberate indifference. *See, e.g.*, *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986). In fact, even gross negligence is insufficient. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Instead, deliberate indifference is comparable to criminal recklessness. *Thomas v. Blackard,* 2 F.4th 716 (7th Cir. 2021) (citing *King*, 680 F.3d at 1018). "'Reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002) (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources*, Inc., 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment

> implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (quoting *Zaya v. Sood,* 836 F.3d 800, 805–06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant knew better than to make the medical decision that [he] did." *Id.* (quoting *Petties v. Carter,* 836 F.3d 722, 731 (7th Cir. 2016)) (citation modified). A medical professional's choice of an "easier and less efficacious treatment" can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry,* 604 F.3d at 441 (quoting *Estelle,* 429 U.S. at 104 & n.10). The Seventh Circuit has "characterized the standard as imposing a high hurdle on plaintiffs because it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rosario v. Brawn,* 670 F.3d 816, 821 (7th Cir. 2012) (quoting *Collins v. Seeman,* 462 F.3d 757, 762 (7th Cir. 2006)).

## I.   Eighth Amendment Deliberate Indifference (Count I)

The first question before the Court is whether Walls' urinary, stomach, and testicular pain and associated complications qualified as a "serious" medical condition within the meaning of Eighth Amendment jurisprudence. Defendants Dr. Shah, Dr. Pelegrin, and Nalewajka do not contest that Walls' medical condition was not "serious" as defined by Seventh Circuit precedent. "[T]he Supreme Court contemplated that medical conditions far less critical than 'life-threatening' would be encompassed by the term." *Gutierrez v. Peters*, 111 F.3d 1364, 1370 (7th Cir. 1997).

However, the Seventh Circuit put common colds, toes with removed toenails, and mild asthma as being outside the ambit of "serious" medical needs. *See id.* at 1372 (citing *Gibson v. McEvers*, 631 F.2d 95 (7th Cir. 1980); *Snipes v. DeTella*, 95 F.3d 586, 591 n.1 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126 (1997); *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996)). Walls' urinary, stomach, and testicular condition prompted medical staff at Centralia to collect several urine samples for analysis, including more rigorous testing for bacterial culture growth; refer Walls to an outside urology specialist; treat his symptoms with several different antibiotics and medications for pain; and conduct further diagnostic imaging and testing. (*See* Doc. 198, Ex. 1, pp. 4−17, Bates 119, 133, 154, 157, 309, 315, 317, 323, 325, 327−330). With this in mind, and with no argument otherwise from the Defendants, this Court finds that Walls' urinary, stomach, and testicular pain and associated complications constitute a serious medical need in line with the first prong of the deliberate indifference standard. *See Fitzpatrick v. Wexford Health Sources, Inc.*, Case No. 3:20-cv-01218-SPM, 2024 WL 4132979, at *3 (S.D. Ill. Sept. 10, 2024).

### A.    Claims against Defendant Drs. Shah and Pelegrin

Having established Walls' urinary, stomach, and testicular pain and associated complications constitute a "serious" medical condition under the Eighth Amendment, we next turn to whether Defendants Shah, Pelegrin, and Nalewajka were deliberately indifferent to his medical condition. We begin with Walls' medical providers, Drs. Shah and Pelegrin. (Doc. 198, ¶ 3). While Walls argues that Shah and Pelegrin failed to properly treat his condition, that they could have prevented later development of

his symptoms, and that there were significant delays in his treatment, the Seventh Circuit has stated that it "has long been clear in our Eighth Amendment cases is that the amendment is not coterminous with a medical malpractice claim." *Forbes*, 112 F.3d at 266 (citing *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996); *Oliver*, 77 F.3d 156; *Snipes*, 95 F.3d 586). Prisoners are "not entitled to the best care possible" but rather "to reasonable measures to meet a substantial risk of serious harm to her." *Id.* at 267. When a prisoner sought "specific treatment and foolproof protection from infection," the Seventh Circuit stated that "[t]he Eight [sic] Amendment does not provide her with either." *Id.* at 266.

Walls alleges in his Complaint that he began experiencing urinary issues in July 2020. (Doc. 2, p. 9). According to policies and procedures at Centralia Correctional Center, inmates were generally required to submit health service requests for non-emergency medical issues; nursing staff at Centralia would then assess the patient's symptoms and may schedule an appointment for the patient to see a physician or contact a physician for verbal orders regarding care. (Doc. 198, ¶ 5). The record establishes that Walls presented to a medical staff at Centralia on July 2, 2020, for back and neck pain, and July 22, 2020, for pain in his back, neck, tongue, and mouth resulting from self-reported seizure activity. (Doc. 198, ¶ 9; *id.*, Ex. 1, pp. 35–37, Bates 373–375; *id.*, Ex. 3, 82:1–18). Dr. Shah saw Walls on July 25, 2020, and evaluated him for back and neck pain, pain medication, and self-reported seizure activity. (Doc. 198, ¶ 10; *id.*, Ex. 1, p. 33, Bates 371). Shah prescribed Walls 7.5mg of Mobic, a prescription nonsteroidal anti-inflammatory drug for pain, daily. (Doc. 198,

¶ 10, *id.*, Ex. 1, p. 78, Bates 2144).

Between August 5, 2020, and September 22, 2020, Walls saw numerous providers, including nursing staff and Dr. Pelegrin, approximately ten times or more for a variety of medical needs aside from his urinary, stomach, and testicular complications.[2] (Doc. 198, Ex. 1, pp. 14−32, Bates 327−341, 367−370). On September 2, 2020, the nurse stated in Walls' progress note that a urinalysis was performed. (Doc. 198, Ex. 1, p. 17, Bates 330). On September 8, 2020, Walls saw Dr. Pelegrin for a follow-up visit regarding his ear; Pelegrin noted "UTI – See CC sheet," and prescribed Walls a seven-day regimen of the antibiotic Bactrum. (Doc. 198, Ex. 1, p. 16, Bates 329; *see* Doc. 198, ¶ 17). On September 22, 2020, Walls was seen by nursing staff for reported burning during urination and white discharge in his underwear. (Doc. 198, ¶ 15; *id.*, Ex. 1, p. 13, Bates 325). The nurse recorded the duration of Walls' symptoms was "a while" and his pain was a 2 out of 10 on the pain scale. (Doc. 198, Ex. 1, p. 13, Bates 325). The nurse obtained a urine specimen and performed a dipstick examination and forwarded the information and results to a physician. (Doc. 198, ¶ 15; *id.*, Ex. 1, p. 13, Bates 325). One week later on September 29, 2020, Walls was again seen by nursing staff for blood in urine as well as burning and discharge. (Doc. 198, ¶ 15; *id.*, Ex. 1, p. 12, Bates 323). Walls reported a 2 out of 10 on the pain

---

[2] Dr. Pelegrin saw Walls on at least one occasion for management and treatment of his chronic seizures, and Walls was treated and prescribed medications for self-reported seizure activity and injuries during this time period. (*See* Doc. 198, ¶ 14; see id., Ex. 1, pp. 28, 76−77, Bates 341, 2114−2115). In addition, Walls was seen for numerous visits and follow-up appointments during numerous visits and follow-ups during this time frame for injuries to his face, nose, and ears he sustained in a purported altercation on August 5, 2020. (*See* Doc. 198, ¶¶ 12−13; see id., Ex. 1, pp. 16, 18, 22, 24, 27, 30; Bates 329, 331, 335, 337, 340, 368). Walls also saw medical providers at the prison on other occasions for seasonal allergies and to have an EKG performed. (*See* Doc. 198, Ex. 1, pp. 17, 22; Bates 330, 335).

scale; the nurse again collected a urine specimen, recorded abnormal findings, and referred Walls to the physician for evaluation of the dipstick result. (Doc. 198, ¶ 15; *id.*, Ex. 1, p. 12, Bates 323).

Pelegrin reviewed Walls' chart the following morning on September 30, 2020, and noted he should be seen the same day if possible. (Doc. 198, ¶ 16; *id.*, Ex. 1, p. 11, Bates 321). Pelegrin saw Walls later that day and noted that he described dysuria (pain or burning during urination) and stated he experienced this for months and was not treated. (Doc. 198, Ex. 1, p. 11, Bates 321). Pelegrin noted Walls had taken Bactrum for seven days and that the burning had stopped for Walls, but blood remained present as well as discharge. (*Id.*). Pelegrin also noted that the results from the urine sample taken on September 22, 2020 were negative for gonorrhea and chlamydia but were positive for a contaminant in the sample.  (Doc. 198, ¶ 17; *id.*, Ex. 1, p. 11, Bates 321). Pelegrin wrote "Pt very upset because he states he did not get all the doses of the Bactrum on the DOT line." (Doc. 198, Ex. 1, p. 11, Bates 321). Pelegrin noted she possibly suspected NGU (non-gonococcal urethritis or inflammation of the urethra not caused by gonorrhea) and prescribed a ten-day regimen of 100mg of Doxycycline and ordered a follow-up visit with Walls in 2 weeks. (Doc. 198, ¶ 17; *id.*, Ex. 1, p. 11, Bates 321).

Pelegrin saw Walls again on October 12, 2020, for the follow-up appointment on Walls' urinary issues, noting that he reported his status was unchanged. (Doc. 198, ¶ 18; *id.*, Ex. 1, p. 10, Bates 317). She also ordered a repeat urinalysis with cultures and sensitivity and planned to consider referral to a urologist for his chronic

discharge. (Doc. 198, ¶ 18; *id.*, Ex. 1, p. 10, Bates 317). Pelegrin ordered Tylenol, a

pain reliever, as needed and planned to follow up with Walls for a separate complaint.

(Doc. 198, ¶ 18; *id.*, Ex. 1, p. 10, Bates 317). Pelegrin saw Walls one week later on

October 19, 2020, noting she discussed his symptoms and treatment through the door

with him as he was in the segregation unit. (*See* Doc. 198, ¶ 19; *id.*, Ex. 1, p. 9, Bates

315; *id.*, Ex. 3, 95:15–23). Pelegrin discussed Walls' urinary symptoms with him and

explained that the urinalysis done on October 16, 2020 showed no growth. (Doc. 198,

¶ 19; *id.*, Ex. 1, p. 9, Bates 315). She also noted Walls stated he was still experiencing

hematuria (or blood in the urine), penile discharge, and lower abdominal pain. (Doc.

198, ¶ 19; *id.*, Ex. 1, p. 9, Bates 315). Pelegrin completed a referral request to a

urologist on the same day, October 19, 2020. (Doc. 198, ¶¶ 7, 19–20; *id.*, Ex. 1, p. 9,

47, Bates 315, 589). The request was approved by Wexford, and more specifically, Dr.

Garcia, on October 26, 2020. (Doc. 198, ¶¶ 7, 20; *id.*, Ex. 1, p. 48, Bates 539; *id.*, Ex.

3, 72:10–24 to 74:1–24).

Pelegrin spoke with Walls through the door in the segregation unit for 15

minutes on November 4, 2020, following Walls' reports to the nurse of self-reported

seizure activity, UTI pain, report of Tylenol being ineffective, and wanting lab results.

(Doc. 198, ¶ 25; *id.*, Ex. 1, p. 7, Bates 157). She prescribed him Ciprofloxacin, an

antibiotic, and Pyridium, a urinary tract pain reliever. (Doc. 198, ¶ 25; *id.*, Ex. 1, p.

7, Bates 157). Pelegrin noted that Walls was awaiting his urology appointment, that

he was offered different pain medications and refused them, and that he was

scheduled for a follow-up visit with her in two weeks. (Doc. 198, ¶ 25; *id.*, Ex. 1, p. 7,

Bates 157). On November 9, 2020, Pelegrin recorded in Walls' chart that he purportedly refused the Ciprofloxacin at some time between November 4, 2020, and November 9, 2020. (Doc. 198, ¶ 27; *id.*, Ex. 1, p. 6, Bates 154).

On November 24, 2020, outside physician Dr. Gary Reagan with Crossroads Urology and Women's Health conducted a consultation and evaluation of Walls and his medical record. (Doc. 198, ¶ 28; *id.*, Ex. 1, p. 45, Bates 509). Dr. Reagan noted that Walls had microscopic hematuria, pyuria (or a high white blood cell count in the urine), and significant dysuria, and noted he discussed with Walls getting a renal ultrasound and a KUB, or kidney, ureter, and bladder X-ray, prior to scheduling Walls for a cystoscopy. (Doc. 198, ¶ 28; *id.*, Ex. 1, p. 43, Bates 505). Dr. Reagan counseled Walls regarding the procedure and possibility of bleeding, infection, or requiring a catheter temporarily and was not given a guarantee as to an outcome. (Doc. 198, ¶ 28; *id.*, Ex. 1, p. 43, Bates 505). Dr. Reagan stated that after results were completed and sent to the office, they could schedule Walls for a cystoscopy, and that Dr. Reagan suspected potential cystitis, prostatitis, or bladder stone. (Doc. 198, ¶ 28; *id.*, Ex. 1, p. 43, Bates 505). No return visit to Crossroads Urology and Women's Health was scheduled at that time. (Doc. 198, Ex. 1, p. 43, Bates 505).

Pelegrin reviewed the records from Walls' urology visit on December 4, 2020, and requested a referral for a renal ultrasound on the same day. (Doc. 198, Ex. 1, p. 46, Bates 579; *id.*, Ex. 2, ¶¶ 24–25). On December 21, 2020, Pelegrin saw Walls for a follow-up visit. (Doc. 198, ¶ 30; *id.*, Ex. 1, p. 5, Bates 133). Pelegrin wrote in the progress note that a KUB X-ray done on December 9, 2020 showed moderate

constipation; she further noted that a renal ultrasound had been requested and a cystoscopy had been requested and should be getting scheduled. (Doc. 198, ¶ 30; *id.*, Ex. 1, p. 5, Bates 133; *see id.*, Ex. 1, p. 72, Bates 1571). Pelegrin assessed Walls as having hematuria that was currently being worked up and ordered fiber and Colace and Milk of Magnesia, both of which are stool softeners or laxatives, as well as increase in water intake, to treat his constipation. (Doc. 198, ¶ 30; *id.*, Ex. 1, p. 5, Bates 133). Pelegrin next saw Walls again on January 18, 2021, for a tooth infection and pelvic pain. (Doc. 198, ¶ 31; *id.*, Ex. 1, p. 4, Bates 119). She noted that Walls reported "he is still having stringy penile [discharge] + [left] testicle is retracted due to pain." (Doc. 198, ¶ 31; *id.*, Ex. 1, p. 4, Bates 119). Pelegrin further observed Walls' scrotum and noted no edema or erythema (or swelling and redness, respectively), and observed the right testicle was normal with no nodules felt while the left testicle retracted upwards and was tender to palpation. (Doc. 198, ¶ 31; *id.*, Ex. 1, p. 4, Bates 119). Pelegrin noted that "Pt really needs his Urology [follow-up] + cystoscopy scheduled!!" (Doc. 198, ¶ 31; *id.*, Ex. 1, p. 4, Bates 119). Pelegrin did not have any further visits or encounters with Walls following his January 18, 2021 visit. (Doc. 198, Ex. 2, ¶ 30).

Walls first key allegation against Shah and Pelegrin is that they violated the Eighth Amendment by failing to adequately address his medical condition. (*See* Doc. 2). Walls alleges that Shah and Pelegrin failed to adequately address his urinary condition and could have prevented the continued complications he experienced for several years into the future, up to and including a purported prostate procedure in

2024. (*See* Doc. 219). In support of his argument, Walls submits medical records from 2021 and later of care he received while at Dixon to demonstrate his ongoing medical problems that were preventable by Pelegrin and Shah and that worsened because of their lack of proper care.. (*See* Doc. 219, pp. 5, 8−9; *id.*, Ex. G). However, the case law makes clear that a claim for deliberate indifference under the Eighth Amendment is not evaluated under the same standard as a claim for negligence or medical malpractice. *See Forbes*, 112 F.3d at 266. Under the Constitution, Walls was not entitled to the best care possible, but instead reasonable measures to meet a substantial risk of serious harm to him—and here, Walls cannot establish Shah nor Pelegrin fell short of this standard. *See id.* at 267. Moreover, Walls presents no evidence to demonstrate any causal link between any acts or omissions on behalf of Pelegrin or Shah and any later developments of his symptoms.

Walls further argues that Shah and Pelegrin acted with deliberate indifference specifically by failing to treat his symptoms or appropriately respond to urinalyses that were performed considering their results. (*See* Doc. 219). As stated previously, disagreement with a doctor's medical judgment alone is not enough to support an Eighth Amendment violation. *See Cesal*, 851 F.3d at 721; *Whiting*, 839 F.3d at 662. Moreover, a prisoner is not entitled to demand specific care. *Forbes*, 112 F.3d at 267. Examining the record presented, this Court does not find that the care (or alleged lack thereof) provided by Defendants Shah and Pelegrin to Walls while he was incarcerated at Centralia evinces "'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rosario*, 670 F.3d at 821 (quoting

*Collins*, 462 F.3d at 762).

Walls saw Dr. Shah once on July 25, 2020, at which his medical records indicate he was evaluated for his complaints related to self-reported seizures. (Doc. 198, Ex. 1, pp. 33, 78). Walls alleges in his Complaint that Shah did not order him any medication for urinary complaints in July 2020. (Doc. 2, p. 9). In his Deposition, Walls testified that Shah, either in June or July, did the urine dipstick analysis. (Doc. 198, Ex. 3, 86:14−24, 87:1−4). Walls complained again of urinary issues or pain on or around September 2, 2020, when a nurse recorded that a urinalysis was performed. (Doc. 198, Ex. 1, p. 17, Bates 330). Even assuming that Walls did, in fact, complain of urinary symptoms to Shah in July 2020, the Court finds that no reasonable jury could conclude that Shah disregarded a substantial risk to Walls' condition which rises to the level of Constitutional violation. Walls points to no evidence regarding his urinary condition at the time to demonstrate that by failing to act, a jury might reasonably find that Shah acted with deliberate indifference towards his serious medical needs. Walls does not allege he was in such pain or otherwise experienced symptoms that put him at such risk that by disregarding it, Shah's conduct rose to the level akin to criminal recklessness. *See Rosario*, 670 F.3d at 821. Further, Walls points to zero facts in the record to demonstrate that his symptoms remained, worsened, or were otherwise ignored by medical staff during July 2020 and September 2020.[3] Simply

---

[3] Walls attempts to argue in further support of his Eighth Amendment claims that Shah was deliberately indifferent towards his urinary complications in August 2020 by failing to provide care. (*See* Doc. 219, pp. 14−15). Walls submits medical records regarding care he received in August 2020 that indicate that Walls had a urine sample analyzed on August 8, 2020, and a note was made by medical staff which reads "[d]ark yellow [sic] slight sediment." (*See* Doc. 219, Ex. D, Bates 3410). These records additionally appear to indicate that on or around the time of the sample and analysis, Walls had been housed in the infirmary and had missed numerous meals and doses of medication

stated, Walls fails to show any genuine, material issue of disputed fact to take this issue to trial; moreover, his Eighth Amendment claims against Shah fail as a matter of law.

Walls' claims for Eighth Amendment deliberate indifference against Dr. Jodi Pelegrin also do not survive summary judgment. The uncontroverted evidence presented to the Court clearly establishes that over the course of several months at Centralia prior to Walls' transfer to Dixon, Dr. Pelegrin was responsive to Walls' complaints of urinary, stomach, and testicular issues and provided various courses of treatment designed to identify and address his underlying problems. (Doc. 198, ¶¶ 12−20, 25−26; 30−31). Pelegrin prescribed multiple different courses of antibiotics to treat Walls' urinary complications, and additionally prescribed pain medications to alleviate his symptoms. (*See id.*, ¶¶ 17, 19). Pelegrin also timely saw Walls for appointments and follow-up visits to monitor his progress. (*See id.*, ¶ 16, 18−19, 29−31). When she was unable to physically examine Walls, she still met with him at the door of his cell unit to meet with him. (*Id.*, ¶ 26). After trying several different courses of treatment, Pelegrin referred Walls to a urology specialist and followed the urologist's recommended plan of action. (*Id.*, ¶¶ 20, 29). Overall, it is abundantly clear to this Court on this record that no reasonably jury could conclude that Dr. Pelegrin

---

and had been in the infirmary for a psych watch due to audiovisual hallucinations and hunger strike. (*Id.*). Walls argues in his Response that Shah was deliberately indifferent to his condition because he had "seen blood/mucus/white blood cells out of range and did nothing but told Plaintiff to drink more water that's it." (Doc. 219, p. 15 (citing Doc. 219, Ex. D)). Walls cannot, however, attempt to inject a factual dispute into the record to overcome summary judgment with mere allegations that lack support from the record. *See Celotex*, 477 U.S. at 322−23. Walls points to no specific evidence to support his contention that Shah observed Walls' urine or that it did, in fact, contain blood, mucus, or white blood cells; in fact, Walls does not point to evidence that establishes Shah saw Walls while he was in the infirmary during this time or that Shah otherwise was responsible for his care.

was deliberately indifferent to Walls' medical condition. This Court finds no evidence demonstrating her conduct rose anywhere close to the level of near-criminal recklessness required to establish liability under the Eighth Amendment. *See Thomas*, 2 F.4th at 716.

Walls argues in Response to the Motion for Summary Judgment that Pelegrin saw an increase in the amount of blood in his urine that he argues was ridiculously bad, warranting a trip to the emergency room at one point, and that the results of his urinalyses worsened over months. (Doc. 219, p. 4). Walls submits in support several documents from his medical record, including results of a urinalysis dipstick from August 8, 2020, September 22, 2020, September 29, 2020, and December 9, 2020, as well as laboratory pathology reports of urine samples. (Doc. 219, Exs. D, E, F). Walls, however, submits no specific evidence, testimony from an expert or otherwise, that demonstrates Pelegrin's choices to prescribe antibiotics and pain medications and refer him to a specialist demonstrated a disregard to a substantial risk to his health. *See Cesal*, 851 F.3d at 721. Pelegrin submitted in her Affidavit in support of her Motion for Summary Judgment that "Walls' condition did not warrant urgent or emergent medical care, so he was not sent to an ER for evaluation during the course of his treatment for his problem." (Doc. 198, Ex. 2, ¶ 28). Walls' disagreement or dissatisfaction with Pelegrin's course of treatment, without more, is not enough to make a colorable claim for deliberate indifference.

Walls' second key allegation against Shah and Pelegrin is that they were responsible for delays in his care that caused him harm and his symptoms to worsen.

(*See* Doc. 1; *id.*, pp. 6, 9, 16). To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain. *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) (citing *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007)). "Of course, delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Petties*, 836 F.3d at 730 (collecting cases for comparison). The Seventh Circuit has affirmed summary judgment in favor of a physician who saw a prisoner one week after a physician assistant referred the patient, promptly requested an MRI, and referred the prisoner for surgery by an outside specialist, even when the prisoner experienced a delay in nine months from the physician's examination until the day of the surgery. *Norwood v. Ghosh*, 723 F. App'x 357, 363–64 (7th Cir. 2018). The Seventh Circuit, in agreement with the district court, held that the delays the prisoner experienced were not attributable to the physician, however, but rather appeared to be "features of the Wexford system of health care rather than anything [the physician] controlled." *Id.* (citing *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002)). As stated above, Walls' allegations that Shah and Pelegrin failed to prevent further complications he experienced in the future by their failures to properly treat his urinary, stomach, and testicular complications lack verifying medical evidence to support it. Walls fails to present any specific evidence in the record, including in his own submitted medical records, that demonstrates a connection between any acts or omissions on the part of

Shah or Pelegrin to any later developments in his care.

Walls also alleges in his Complaint that he experienced a delay in care because his follow-up appointment with Dr. Reagan was never scheduled; he alleges that Pelegrin and Health Care Unit Administrator Nalewajka are responsible for this delay. As to his claims against Pelegrin specifically, Walls argues that Pelegrin failed to inquire as to why her referral to the outside specialist had not yet been approved and failed to inquire as to the scheduled date for his follow-up appointment with outside care. (Doc. 219, p. 6). Walls argues this could have been fixed by Pelegrin, citing IDOC Administrative Procedure 04.03.103. (*See* Doc. 219, Ex. A). This procedure generally provides that if a facility physician, physician's assistant or nurse practitioner deems specialty services necessary, a referral shall be submitted to the Facility Medical Director, who was responsible for approving or denying referrals. (*See id.*). If approved, the Facility Medical Director shall ensure services are scheduled, and health care staff were responsible for scheduling the pending specialty service. (*See id.*).

While it is not clear that Pelegrin, who was "employed by Wexford Health Sources, Inc. as the medical director at [Centralia] at all relevant times," was the "Facility Medical Director" or "Agency Medical Director" as defined by the Administrative Procedure, the record makes clear that Pelegrin's request was submitted for approval and approved by Dr. Garcia via a "Notice of Approval." (*See* Doc. 198, Ex. 1, p. 48, Bates 593). Further evidence indicates that Pelegrin followed the same procedure for requesting Walls' renal ultrasound and noted in his chart that

they were awaiting approval of her referral requests and that Pelegrin was specifically aware of the need for Walls' cystoscopy to be scheduled. (*See* Doc. 198, ¶ 31; *id.*, Ex. 1, p. 4, Bates 119). Thus, while it appears that Pelegrin was not, in fact, responsible for scheduling the services she requested, even if she were, this Court does not find that, on these facts, a delay from December 4, 2020, to February 1, 2021, in the scheduling of a follow-up appointment with a medical specialist rises to the level of a Constitutional violation. First, the evidence indicates that Pelegrin took steps to conduct the testing and imaging that Dr. Reagan requested be completed prior to scheduling the follow-up appointment—for instance, Walls' KUB X-ray was completed on December 9, 2020. (Doc. 198, Ex. 1, p. 72, Bates 1571). Next, the evidence demonstrates that scheduling outside specialist appointments during late 2020 and 2021 was particularly difficult due to the COVID-19 pandemic and quarantine procedures in place, and Walls' condition was not one that warranted immediate medical treatment or emergency services. (Doc. 198, ¶ 32). And finally, Walls fails to make the requisite showing that he was specifically harmed by this failure to have his appointment scheduled; the record shows that he was still receiving pain medications and different antibiotics for his urinary, stomach, and testicular issues during this time. (*See* Doc. 198, ¶¶ 30−31).

Accordingly, the Court finds that Walls has failed to demonstrate the existence of a genuine dispute of material fact to submit his case before a jury. In addition, this Court finds that Walls has failed, as a matter of law, to establish claims against Shah and Pelegrin for deliberate indifference pursuant to the Eighth Amendment with

respect to Count I, and therefore summary judgment is granted in favor of Shah and Pelegrin.

### B.    Claims against Defendant Nalewajka

Next, we examine whether Health Care Unit Administrator Lana Nalewajka was indifferent to Walls' serious medical condition of urinary, stomach, and testicular pain and associated complications. As an initial matter, Nalewajka was an employee of Illinois Department of Corrections and, in her role, was responsible for directing, coordinating, and reviewing activities of healthcare operations in conjunction with the Medical Director and Nursing Director at Centralia, both of whom were employees of Wexford. (Doc. 203, ¶ 4). Additionally, she provided in her Affidavit that she reviewed grievances regarding medical treatment, communicated with individuals in custody and family members regarding their medical issues, communicated with the physicians regarding their treatment plans to better inform individuals in custody of their treatment plans, and answered requests from individuals in custody. (Doc. 203, Ex. 2, ¶ 2). Nalewajka, while licensed as a registered nurse, was not responsible for the direct medical care of Walls and did not provide medical care to Walls. (Doc. 203, ¶¶ 5−6; *id.*, Ex. 3, 176:6−17). Thus, as a nonmedical prison administrator, Nalewajka was entitled to defer to the judgment of prison medical professionals so long as she did not ignore Walls. *See Berry*, 604 F.3d at 440.

In addition to the facts in the record previously recounted in this Order, the record establishes the following: Walls filed Grievance #20-11-184 on November 17, 2020, in which he wrote that, for months, he was repeatedly told by his doctor and

other nurses that he would be seen by an outside urologist for his painful urinary-related medical issues, but that he was never scheduled for care. (Doc. 203, ¶ 9); *id.*, Ex. 4, p. 2). Centralia Correctional Center responded to the Grievance on December 4, 2020, stating that, "[p]er HCUA: Offender went to see a urologist specialist on 11/24/2020 for the complaints voiced in the grievance." (Doc. 203, ¶ 10; *id.*, Ex. 4, p. 2). It is also undisputed that Nalewajka responded to Walls' complaints on more than one occasion. Walls testified at his Deposition that Nalewajka would speak to him directly at his cell, where she would inquire about his complaints or request slips Walls had submitted regarding the severity of his symptoms. (Doc. 203, ¶ 11; *see id.*, Ex. 3, 190:4–19; 192:2–15; 194:11–15). Walls also testified that on one occasion, Dr. Pelegrin came to see Walls at his cell and reported she was sent to see him by Nalewajka. (Doc. 203, ¶ 12; *id.*, Ex. 3, 194:11–24).

Nalewajka was on leave of employment from December 1, 2020, to January 6, 2021, for personal medical reasons. (Doc. 203, ¶ 21). Following her return in January 2021, she reviewed Walls' medical record around the time that the Health Care Unit was notified of his impending transfer to Dixon; Walls' records at the time did not indicate there was a medical hold in place or that there were scheduled medical procedures which would require Walls to have remained physically present at Centralia Correctional Center to be completed. (Doc. 203, ¶ 22). Additionally, upon her review of Walls' medical record, Nalewajka learned that Walls had been referred for a cystoscopy and renal ultrasound but neither had been scheduled. (*Id.*, ¶ 25). Nalewajka took action to facilitate scheduling both procedures at his destination

facility of Dixon Correctional Center by notifying them of the referrals and documenting that the referrals had not been scheduled. (*Id.*). On this record, this Court finds that no reasonable jury could conclude that Nalewajka was deliberately indifferent to Plaintiff's serious medical condition.

Walls believes and argues that Nalewajka was responsible for coordinating outside care, such as coordinating his urology specialist appointment. (*See* Doc. 221, p. 1−2; Doc. 203, Ex. 3, 170:22−24, 171:1−7). In support, Walls again points to Illinois Department of Corrections Administrative Directive 04.03.103, which states, in relevant part, that, if the response to the referral to an outside specialist from the vendor's Utilization Management Unit is not received within five working days, the Facility Medical Director shall advise the Health Care Unit Administrator who shall contact the Agency Medical Director." (Doc. 221, p. 2; *id.*, Ex. A). The record establishes to this Court that Defendant Nalewajka's role at Centralia was to direct, coordinate, and review activities of healthcare operations at the facility, and, according to the Administrative Directive provided by Walls, to, in essence, facilitate communication between the Agency Medical Director and the Facility Medical Director regarding the status of the referral request. (Doc. 221, Ex. A). Walls argues that Nalewajka failed to take action with respect to the referral for outside care and failed to appeal to the medical director. (Doc. 221, pp. 1−2). Further, Walls argues she failed to ensure his cystoscopy, ultrasound, and follow-up appointment with Dr. Reagan was scheduled. (*See id.*). Walls, however, points to no specific evidence that creates a factual dispute that Nalewajka was responsible for scheduling

appointments or otherwise failed to follow the Administrative Directive such that she disregarded a substantial risk to his medical needs. (*See* Doc. 198, Ex. 1, pp. 47–48, Bates 589, 583). The record demonstrates that Dr. Pelegrin completed a referral request for a renal ultrasound for Walls on December 4, 2020, during which time Nalewajka was absent for her medical leave, and upon her return and review of his records, she learned of his pending transfer and took steps to facilitate the referral requests with his destination facility. (*See* Doc. 198, Ex. 1, p. 46, Bates 579). The record lacks information as to whether Wexford's Utilization Management team had reviewed the request or took any action while he was still at Centralia, but case law makes clear that Nalewajka is not responsible for matters outside of her control, and nothing before this Court indicates she was responsible for the scheduling lapse. While the lack of response to Pelegrin's referral requests is indeed questionable by this Court, this demonstrates, at best, negligence or oversight on the part of the medical providers at Centralia rather than deliberate conduct by Nalewajka in light of Walls' serious medical needs. Simply stated, Walls' allegations, without more, are not enough to make a claim for deliberate indifference.

Moreover, the record establishes with this Court that Nalewajka followed the guidance of the health care providers on Wexford's staff, deferring to their medical judgment, while also communicating with Walls and responding to his complaints and Grievances. Accordingly, this Court finds no genuine dispute of material fact and Walls has failed to make a claim for Eighth Amendment deliberate indifference as a matter of law. Summary judgment will be granted in favor of Nalewajka as to Count

I.

## II.    Eighth Amendment Failure to Institute Medical Hold (Count II)

In his second claim against Defendants, Walls argues that Dr. Pelegrin and Health Care Unit Administrator Nalewajka are liable under the Eighth Amendment for failing to institute a medical hold on Walls to prevent his transfer from Centralia Correctional Center to Dixon Correctional Center, which occurred on February 1, 2021. (*See* Doc. 1, pp. 12–14; Doc. 16, p. 6). The primary thrust of Walls' argument is that, upon reviewing his medical record and following his visit with outside urologist Dr. Reagan, Defendants Pelegrin and Nalewajka should have put a medical hold in place or ensured one was in place such that Walls would not be transferred and he could continue his care with Dr. Reagan. (*See* Doc. 219, pp. 5–6, 11). Walls argues that he was harmed because his care was delayed due to the transfer and having to see a new provider at Dixon Correctional Center. (*Id.*, p. 11).

It is undisputed that Walls was transferred from Centralia to Dixon because of a recommendation for him to receive treatment at a residential treatment unit for his mental health. (*See* Doc. 198, ¶ 33; *id.*, Ex. 3, 188:6–8). More specifically, Walls was recommended for a transfer to a residential treatment unit by social worker Terri Schulte on October 15, 2020, due to the severity of his mental health symptoms and mental health history, and Schulte's belief that Walls would benefit from a structured milieu that can provide more intensive services. (Doc. 198, ¶ 22; *id.*, Ex. 1, pp. 54–57, Bates 1064–1067; *see also* Ex. 3, 123:12–24; 124:1–5). Walls' treating psychiatrist, Dr. Michael Bednarz, wrote on October 15, 2020, that he agreed with Schulte's

rationale for referral and due to the severity of Walls' mental illness, he required a more structured environment to meet his mental health needs. (Doc. 198, ¶ 22; *id.*, Ex. 1, p. 54, Bates 1064). Schulte further wrote in her rationale for referral of Walls to a Residential Treatment Unit that Walls had a series of repeated negative interactions with staff and other offenders resulting in two physical altercations as a result of some of his mental health symptoms. (Doc. 198, ¶ 23; *id.*, Ex. 1, p. 57−70, Bates 1067−1080). Since July 3, 2020 to the time of the report in October 2020, Schulte stated that Walls had twelve disciplinary reports including insolence, disobeying direct orders, intimidation and threats, and two fights; from January 2019 to July 2020, by contrast, he had only acquired three disciplinary reports. (Doc. 198, Ex. 1, p. 57, Bates 1067). Schulte reported that Walls exhibited paranoid ideation that staff and offenders were targeting him due to multiple grievances and a lawsuit he had against the facility and that he had been refusing housing and stating he needed to be in protective custody because he was being targeted. (Doc. 198, ¶ 23; *id.*, Ex. 1, p. 57, Bates 1067). He had been placed in restrictive housing three times between July 2020 and the time of Schulte's referral in October 2020 and had been on crisis watch for several days in August 2020 for auditory hallucinations. (Doc. 198, ¶ 23; *id.*, Ex. 1, p. 57, Bates 1067). Walls had been in restricted housing at the time of Schulte's report and refused to work with staff at the facility for fear they were lying or working against him, refused all structured out of cell programming, and refused to leave his cell to bathe. (Doc. 198, ¶ 23; *id.*, Ex. 1, p. 57, Bates 1067). Walls had been scheduled to leave restricted housing on October 16, 2020, but stated he

would refuse to leave restricted housing until he was transferred from the facility for his safety. (Doc. 198, ¶ 23; *id.*, Ex. 1, p. 57, Bates 1067). Schulte reported that Walls had been refusing any medications to treat his mental illnesses. (Doc. 198, Ex. 1, p. 56, Bates 1066).

Prior to Schulte's report, on October 9, 2020, Walls submitted a request to Schulte stating "please just put me in to go to Dixon." (*See* Doc. 198, ¶ 21; *id.*, Ex. 1, p. 60, Bates 1070). On October 13, 2020, Schulte completed a progress note following a meeting with Walls in which she noted that Walls stated he wanted to stay in restricted housing until he transferred and told Schulte if he got transferred to Dixon it would prove he was not the problem there, and that he would do just fine there. (*See* Doc. 198, ¶ 21; *id.*, Ex. 1, p. 63, Bates 1073). Just prior to Walls' transfer to Dixon, on January 22, 2021, Schulte reported in a progress note that Walls had received a disciplinary report on that day for misuse of property and recorded that Walls reported to staff "he was wanting transferred from the facility and felt if he acted out this would get him transferred." (Doc. 198, Ex. 1, p. 71, Bates 1081).

On November 13, 2020, Walls signed a Notice of Impending RTU/Inpatient Transfer form which informed Walls that it was recommended that he be transferred to Dixon Correctional Center for further evaluation and treatment and that he had the opportunity to appeal the decision. (Doc. 198, ¶ 24; *id.*, Ex. 1, p. 73, Bates 1877). Walls indicated on the form he did not request a hearing regarding his proposed transfer. (Doc. 198, ¶ 24; *id.*, Ex. 1, p. 73, Bates 1877). On November 13, 2020, Schulte completed a progress note following a meeting with Walls in which Schulte reported

that she discussed Walls' pending transfer to Dixon and that Walls continued to
report that he wanted to go to Dixon and signed the notification for transfer and
denied a request for a hearing. (Doc. 198, Ex. 1, p. 75, Bates 1879).

On February 1, 2020, nursing staff at Centralia Correctional Center filled out
an Offender Health Status Transfer Summary in which Walls' current medications
were listed as well as specialty referrals for a cystoscopy and a renal ultrasound, both
of which were labeled as not scheduled. (Doc. 198, Ex. 1, p. 2, Bates 115). On February
3, 2020, nursing staff at Dixon Correctional Facility conducted a reception screening
of Walls and recorded that a renal ultrasound had been completed that day. (*Id.*).

In her Motion for Summary Judgment, Pelegrin argues that she was not
notified about the impending transfer and had no opportunity to influence the
situation regarding his transfer. (Doc. 198, p. 18). Moreover, Pelegrin argues, Walls
cannot demonstrate he was harmed by the transfer to Dixon because he testified that
the medical resources available at Dixon were superior to those at Centralia, and
even if she did know of the transfer, she had no reason to believe a hold was necessary
or that the medical team at Dixon could not manage his care. (*Id.*). Defendant
Nalewajka also argues that she also is not liable under the Eighth Amendment
because she had no role in delaying medical treatment and could not have issued a
medical hold. (Doc. 203, p. 12). More specifically, as the Health Care Unit
Administrator, she did not have the authority to make a medical determination to
place a medical hold to stop his transfer, and there were no scheduled appointments
that might otherwise suggest a medical hold was in place by a doctor. (*Id.*, p. 13).

Nalewajka also argues that Walls is unable to produce evidence that he suffered harm resulting from Nalewajka's failure to prevent his transfer to Dixon. (*Id.*, p. 14).

The Court finds that Walls fails to rebut Pelegrin's and Nalewajka's evidence establishing they were not personally responsible for instituting a medical hold on Walls and that a medical hold for his continued care with Dr. Reagan was necessary. While Walls adamantly argues that Pelegrin and Nalewajka should have known a medical hold was necessary upon reviewing his medical record, these allegations are not supported by facts in the record. It is clear that the recommendation for a transfer was approved by the physician treating Walls' mental health concerns, and that the transfer request was made (and not contested by Walls) *before* his outside appointment with Dr. Reagan occurred. Walls was on notice of his pending transfer and had even requested to the social worker that he be transferred to Dixon; there is no evidence that he took steps to notify Pelegrin or Nalewajka of his pending transfer or his desire to continue in the care of Dr. Reagan. As stated previously, Walls submits no evidence to dispute that Defendants followed administrative directives regarding his transfer.

Moreover, Walls cannot establish that he was harmed by the purported delays caused by the transfer. Walls summarily argues he was harmed by the transfer to Dixon prior to his follow-up appointment with Dr. Reagan because, he states, a transfer to a different prison facility will only and always delay treatment because no doctor wants to start where another doctor left off, in case the last doctor did something wrong from the beginning. (Doc. 219, p. 11). In support, Walls submits

extensive documentation of his medical records from November 2021 to April 2024 which shows the care he continued to receive at Dixon and thus the ongoing harm he suffered following the transfer. (*See* Doc. 219, Ex. G). This evidence, however, is not relevant to any acts or omissions on behalf of Pelegrin or Nalewajka. First, Pelegrin and Nalewajka were not responsible for Walls' care once he was transferred to another facility. Second, Walls fails to submit verifying medical evidence that shows a causal connection between any of his continued symptoms or complications and any acts or omissions by Pelegrin or Nalewajka. His unsupported allegations here do not substantiate an Eighth Amendment claim. Walls' evidence, at most, demonstrates that the urinary, stomach, and testicular issues he began experiencing at Centralia continued after he was transferred to a new facility, but does not establish even the inference that the delays associated with the transfer exacerbated his issues or unnecessarily prolonged his pain. *See Reck*, 27 F.4th at 483. The uncontroverted evidence demonstrates that both Pelegrin and Nalewajka took steps to facilitate Walls' continuation of care at Dixon once they learned of it by providing medical providers there with information regarding the services he needed upon arrival. (Doc. 198, ¶ 38; Doc. 203, ¶ 25). Moreover, Walls himself testified at his Deposition that the care available to him at Dixon was superior to that at Centralia, which further negates any inference that Pelegrin or Nalewajka acted with deliberate indifference with respect to his transfer.

In summary, based on the foregoing, this Court finds that no reasonable jury could conclude that Dr. Pelegrin or Health Care Unit Administrator Nalewajka

violated the Eighth Amendment in relation to Walls' transfer from Centralia to Dixon on February 1, 2021. Accordingly, Dr. Pelegrin's Motion for Summary Judgment and Nalewajka's Motion for Summary Judgment are both granted with respect to Count II.

### III.  Qualified Immunity

In the alternative, Defendant Nalewajka argues she is entitled to qualified immunity. (*See* Doc. 203, pp. 15−17). While the Court need not assess Nalewajka's qualified immunity argument by virtue of the fact that Walls' Eighth Amendment claims do not survive her Motion for Summary Judgment, the Court will briefly discuss the applicability of qualified immunity to the instant facts.

In the alternative to their arguments against each of Walls' claims, Nalewajka argues that she is entitled to qualified immunity because "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (*Id.*, p. 15 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Nalewajka argues that she is "clearly immune because the record contains no evidence showing that Defendant had actual knowledge of, and willfully disregarded, either Plaintiff's serious medical needs or the risk of delay in treatment arising from Plaintiff's transfer to Dixon." (*Id.*, p. 16). In addition, Nalewajka argues that qualified immunity certainly applies to Walls' claims that his Eighth Amendment rights were violated when Nalewajka failed to ensure a medical hold was in place to prevent his transfer to Dixon, because

Walls' disagreement with prison officials about the timing and nature of his transfer to another facility does not create a cognizable constitutional injury. (*Id.* (citing *Williams v. Caldwell*, No. 14-cv-1416-JPG, 2015 WL 327009, at \*4 (S. D. Ill. 2015); *DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992))). Walls argues in Response that he has clearly shown a violation of an established constitutional right. (Doc. 221, p. 11).

"Qualified immunity is an affirmative defense, but once it is raised the burden shifts to the plaintiff to defeat it." *Holleman v. Zatecky*, 951 F.3d 873, 877 (7th Cir. 2020) (citing *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001)). "To overcome qualified immunity, the facts viewed in the light most favorable to [the plaintiff] must 'show that the defendant[s] violated a constitutional right' and that 'the right was clearly established at [that] time.'" *Id.* (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 550 (7th Cir. 2017)). "'If either inquiry is answered in the negative, the defendant official is protected by qualified immunity.'" is answered in the negative, the defendant official is protected by qualified immunity." *Griffin v. Poynter*, No. 1:20-CV-01427-JEH-RLH, 2025 WL 3187367, at \*10 (C.D. Ill. Nov. 13, 2025) (quoting *Koh v. Ustich*, 933 F.3d 836, 855 (7th Cir. 2019)).

Regarding Walls' Eighth Amendment claims, the Seventh Circuit has established that "[w]hen considering deliberate-indifference claims challenging the medical judgment of prison healthcare personnel, qualified-immunity analysis requires us to frame the legal question with reasonable specificity." *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019). To be clearly established, a constitutional

right must have a sufficiently clear foundation in then-existing precedent; qualified immunity applies unless the specific contours of the right were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Griffin*, 2025 WL 3187367, at *10 (citing *Campbell*, 936 F.3d at 545). "'Clearly established law cannot be framed at a high level of generality.'" *Id.* (quoting *Campbell*, 936 F.3d at 545) (citation modified). Additionally, "'[f]or purposes of qualified immunity, [the Eighth-Amendment] duty' to treat prisoners' serious medical conditions 'need not be litigated and then established disease by disease or injury by injury.'" *Id.* at 548 (quoting *Est. of Clark*, 865 F.3d at 553). Moreover, "[w]hen prison officials utterly fail to provide care for a serious medical condition, the constitutional violation is obvious and qualified immunity offers little protection." *Id.* (citing *Orlowski v. Milwaukee County*, 872 F.3d 417, 422 (7th Cir. 2017)).

Here, Walls cannot argue that his urinary, stomach, and testicular pain and associated complications were not treated at all, which is clearly not the case. His argument, then, must be that prison officials persisted in treatment that was ineffective. *See id.* at 547 (quoting *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (citing *Petties*, 836 F.3d at 729–30). This argument also fails because it has clearly been established that Walls received treatment for his urinary, stomach, and testicular issues.  Like in *Campbell*, there is no Circuit precedent indicating that the course of care for his urinary, stomach, and testicular pain and issues violated a constitutional right, meaning that Nalewajka was not on notice of a constitutional violation and would be entitled to qualified immunity if the Court reached that

question.

## Conclusion

For the reasons set forth above, the Motion for Summary Judgment filed by Defendants Shah and Pelegrin (Doc. 197) is **GRANTED**; the Motion for Summary Judgment filed by Defendant Nalewajka (Doc. 203) is likewise **GRANTED**. Accordingly, this case is hereby **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED:  February 10, 2026**

_**s/ Stephen P. McGlynn**_
**STEPHEN P. McGLYNN**
**U.S. District Judge**